UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Dolores Best, Executrix of the Estate | ) | |
| of Willie Best, Deceased | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No.: 2007 CA 00007 |
| | ) | Judge (PLF) |
| United States of America | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS AND FOR SUMMARY JUDGMENT**

Comes now, Plaintiff, Deloris Best, Executor for the Estate of Willie Best, by counsel, Kenneth D. Bynum and Ronald Dixon of Bynum and Jenkins, PLLC, and respectfully opposes the Defendant, United Stats of America's Motion to Dismiss and for Summary Judgment. As grounds for the Opposition, the Plaintiff states as follows:

1. Plaintiff has established a special relationship with the Defendant and, as such, the Defendant owed a duty to the Best's not to place them in a location where it was foreseeable that they would be harmed.

2. The Defendant's decision making did not involve discretion.

3. It was foreseeable that Willie Best would be assaulted after placing him in dangerous public housing after accepting him in the Emergency Witness Protection Program.

4. The Defendant's liability is the same as private individual's would be.

5. The Emergency Witness Protection Program ("EWAP") was a relocation program that allowed the Defendant to use EWAP funds to place a witness in a secured location.

6. The Housing And Urban Developments ("HUD") program was administered by the HUD Inspector General and the District of Columbia Housing Authority and was not designed as a security program or administered by the Defendant.

7. Plaintiff has sufficiently stated a claim upon which relief can be granted.

8. There are genuine issues of material facts such that summary judgment can not be granted.

Wherefore, Defendant's Motion should be denied.

Respectfully submitted,
Deloris Best

s/_____
Kenneth D. Bynum
DC Bar No.: 424515


s/_____
Ronald Dixon
DC Bar No.: 954628
Bynum and Jenkins, PLLC
901 North Pitt Street, Suite 320
Alexandria, VA 22314

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Dolores Best, Executrix of the Estate )
of Willie Best, Deceased )
)
    Plaintiff )
)
v. ) Civil Action No.: 2007 CA 0007
) Judge Friedman
United States of America )
)
)
    Defendant. )

**PLAINTIFF'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF THE OPPOSITION TO
THE MOTION TO DISMISS AND FOR SUMMARY
JUDGMENT**

Comes now, Plaintiff, Deloris Best, Executor for the Estate of Willie Best, by

counsel, Kenneth D. Bynum and Ronald Dixon of Bynum and Jenkins, PLLC, and files a

Memorandum of Points and Authorities in Support of the Opposition to the Defendant's

Motion to Dismiss and for Summary Judgment.

**STATEMENT OF FACTS**

The Plaintiff, Deloris Best on behalf of the estate of Willie Best, Willie Best,

Anthony Best, and Ronald Doy, were residents of the Public Housing Project known as

Lincoln Heights.  In September of 2004, they resided at 219 51th Street N.E. #12.  On

September 12, 2004, they were the victims of an Armed Robbery that extended to Armed

Burglary in the first degree.  *See*, Exhibit 1 ¶ 2-3 , Affidavit of Deloris Best. *See,* Exhibit

2 ¶ 2-3, Affidavit of Ronald Doy.  Ms. Best immediately called the police to report the

incident and they arrived shortly thereafter.  Later, the Bests and Mr. Doy met with

Detective Steven McDonald, who was responsible for investigating the armed robbery, and they gave him information about the offenses. The Bests and Mr. Doy were afraid to remain in their apartment because their neighbors were aware that they called the police to report the robbery. *See*, Exhibit 1¶ 6-8; Exhibit 2 ¶ 6-8. The Best's and Mr. Doy were afraid because of the character of their neighborhood and the view of their neighbors that people who cooperated with the authorities were "snitches." *See*, Exhibit 1 ¶ 9; Exhibit 2 ¶ 9; Exhibit 3 ¶ 14 Affidavit of Willie Toland.

After hearing the Bests and Mr. Doy express strong fear for their safety Det. McDonald took them to the Office of the United States Attorney for the District of Columbia (Department of Justice "Defendant")for an interview with members of the Victim Witness Unit and more specifically with Witness Security Specialist Lavern Forrest.[1] *See*, Exhibit 1 ¶ 11-12; Exhibit 2 ¶ 11-12. Duane Blunt had been arrested on September 14, 2004, at approximately 8:30 P.M. Exhibit 4, Metropolitan Police Department form 163. His arrest shifted the responsibility of investigation and the Bests protection to the USAODC. *See,* Plaintiff's Complaint ¶ 6-8. The Defendant, knowing that the perpetrators of these offenses against the Bests and Mr. Doy were dangerous sought and received a hold of Duane Blunt, pursuant to D.C. Code 23-1322(b)(1)(A). Exhibit 5, Pretrial Detention Order for Duane Blunt.

After hearing from the Bests and Mr. Doy the Defendant told them to pack an overnight bag and moved them out of Lincoln Heights Public Housing Project to an undisclosed location in Virginia for their safety. *See*, Exhibit 1¶ 15; Exhibit 2 ¶ 15. The Bests and Mr. Doy remained in hotels until November 2, 2004, until she received a call

---

[1] We note for the record that the Bests' and Mr. Doy were interviewed by Ms. Forrest who has not provided an affidavit about her contact with them or her instructions to them. It is undisputed that Ms. Cartwright never met with the Bests or Mr. Doy and her affidavit should not be a substitute for Ms. Forrest.

from Ms. Forrest telling her to go to Barry Farms to inspect an apartment.  Ms. Best immediately told Ms. Forrest that she did not want to go to Barry Farms because it was as dangerous as Lincoln Heights. *See*, Exhibit 1¶ 22, 26-27; Exhibit 22, 23, 26-27; Exhibit 3 *passim.*  After Ms. Best refused to go to Barry Farms Ms. Forrest nor anyone in her office had Ms. Best come in to sign a form declining the EWAP service. *See*, Exhibit 1 ¶ 32; Exhibit 2 ¶ 32 ; Affidavit of Heather Cartwright ¶ 11, attached as an exhibit to Defendant's Motion to Dismiss.

Ms. Forrest told Ms. Best that she had no choice "she could go to Barry Farms or back to Lincoln Heights." *See*, Exhibit 1 ¶ 28, 30; Exhibit 2 ¶ 28, 30.  Ms. Best felt she had no choice so she went to inspect the apartment in Barry Farms. *See*, Exhibits 1¶ 33; Exhibit 2 ¶ 33.  After Ms. Best inspected the apartment in Barry Farms she informed the person who showed her the apartment that she did not want it and left.  *See*, Exhibit 1¶ 34-35.  Ms. Best called Ms. Forrest later on Nov. 2, 2004 to tell her that she declined the apartment.  *See*, Exhibit 1 ¶ 38.  Ms. Forrest did not tell Ms. Best to come in to sign a declination form declining the EWAP services.  *See*, Exhibit 1 ¶ 38; Exhibit 2 ¶ 38; Cartwright Affidavit  ¶ 11

Ms. Forrest again told Ms. Best that she had no choice and she had to take the apartment in Barry Farms. *See*, Exhibit 1 ¶ 39;  Ms. Best took the apartment in Barry Farms on Nov. 3, 2004, and moved in shortly thereafter.  Thereafter, Ms. Best moved into Barry Farms and while there she and Mr. Doy came in contact with maintenance people from  Lincoln Heights who recognized them as being from Lincoln Heights. *See*, Exhibit 1¶ 41; Exhibit 2 ¶ 40.  A short time after they saw the maintenance people they was informed that the maintenance people were telling people at Lincoln Heights that we

were living in Barry Farms. *See*, Exhibit 1 ¶; Exhibit 2 ¶.  On January 8, 2005, Willie

Best was shot dead in the hallway in front of his apartment in Barry Farms by a lone

assailant. *See*, Exhibit 1 ¶ 48-51.

The Bests' received letters from the Defendant commencing in September of 2004 and

carrying through  December of 2004, advising them of the status of the cases against

Deigo Pryor and Duane Blunt and advising them that it was required to notify all victims

about services available to them.  The services included but were not limited to,

"information about witness assistance and protection, and arranging for reasonable

witness assistance or protection if you are threatened, harassed or intimidated because of

your involvement in this case." *See*, Exhibits  6, 7.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). Genuine issues of fact are those "that

properly can be resolved only by a finder of fact because they may reasonably be

resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 106

S.Ct. 2505, 2511, 91 L.Ed. 2d 202, 213 (1986). A material fact is one that affects the

outcome of the suit. *See id.* at 248; *see also*, *Spiegel v Leavitt*, 2005 U.S. Dist. LEXIS

22470, *10-11 (D. D.C. 2005).

The party moving for summary judgment "bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of

[the record] which it believes demonstrate the absence of a genuine issue of material

fact." *Celotex Corp v. Catrett,* 477 U.S.317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party fails to make a showing sufficient to establish the existence of an essential element of that party's case, and on which that party will bear the burden of proof at trial. *Id*. at 322, *see also, Burlington Ins. Co. v. Okie Dokie, Inc.,* 2005 U.S. Dist. LEXIS 25162, *6-7 (D. D.C. 2005).

Summary judgment is appropriate only where the facts submitted to the trial court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Osbourne v. Capital City Mortg. Corp.*, 667 A.2d 1321, 1324 (D.C. 1995) (quoting Super. Ct. Civ. R. 56(c)). "Once the movant has made an initial showing that there is no genuine issue of material fact, the non-moving party then has the burden to show that an issue does exist." *Brown v. Consolidated Rail Corp.*, 717 A.2d 309,311 (D.C. 1998) (quoting *Claytor v. Owens-Corning Fiberglass Corp.*, 662 A.2d 1374, 1381 (D.C. 1995)).   In order to defeat a motion for summary judgment, the non-movant must set forth specific facts demonstrating that a genuine issue of material fact exists. *See, Potts v. District of Columbia*, 697 A.2d 1249, 1251 (D.C. 1997). In addition, the court must view both the motion and the record of the case developed thus far in the light most favorable to the non-moving party. *Bailey v. District of Columbia,* 668 A.2d 817,819 (D.C. 1995).  Upon an opponent's satisfactory showing of a factual dispute, the court should not accept the movant's statement of facts as undisputed. *See,  Williams v. Gerstenfeld*, 514 A.2d  1172, 1176 (D.C. 1986).

In addition, regarding the Defendant's Motion to Dismiss, the court must view both the motion and the record of the case developed thus far in the light most favorable

to the non-moving party and accept the allegations are true. *Bailey v. District of Columbia*, 668 A.2d 817,819 (D.C. 1995).

## SUMMARY OF ARGUMENT

The Defendant claims that it is immune from the Plaintiff's suit under the Federal Tort Claims Act, 28 U.S.C. s 2680(a), which exempts certain conduct from the limited waiver of sovereign immunity created by the Federal Tort Claims Act, 28 U.S.C. 1346(b).

Defendant makes this claim under the doctrine of discretionary function. The facts of this case do not support the exercise of the discretionary function immunity defense because, pursuant to the two step analysis first established in *Berkovitz v. United States*, 48 U.S. 531 (1988), (1) there is a specific prescription governing the actions of the Defendant's Victim Witness Unit that Ms. Forrest failed to follow and (2) the challenged conduct of the Defendant, placing Willie Best and his family in the Barry Farms Public Housing Project, did not involve an element of judgment grounded in social, economic and political policy. Id. At 536-37; *United States v. Varig Airlines*, 467 U.S. 797, 813 (1984).

Defendant claims that Willie Best and his family were assisted by the EWAP when they moved them from hotel to hotel. They also claim that the placement in Public Housing was part of the EWAP program. In truth, the EWAP program is separate and distinct from the HUD program. When the Bests' and Mr. Doy were placed in Barry Farms Public Housing that was an act completely under the control of the D.C. Housing and not the USAODC. The Defendant had no authority to condition Plaintiff's

acceptance of the apartment in Barry Farms as a condition to remain in the EWAP

program. *See*, Cartwright Affidavit ¶ 11,15, 17; Exhibits 1 *passim*, Exhibit 2 *passim*.

Defendant also fails in its  private analogue argument because when they placed the

Bests and Mr. Doy in Barry Farms it was pursuant to a special relationship that the

Defendant shared with the Plaintiff.  This special relationship existed because the

Defendant was mandated by statute and internal Department of Justice regulations to

provide reasonable protection for victim/witnesses.  The Defendant knew or should have

known given this special relationship it had with Plaintiff, a witnesses in a criminal case

in the District of Columbia Superior Court who came forward asking for protection, it

was obligated to place them in housing where they would be safe.  The Defendant chose

to force the Plaintiff to accept housing in an area that it knew was a high crime area, and

one that was inhospitable to victim/witnesses.  Generally no tort for harm will lie where

the harm was caused by the criminal act of a third party.  However, liability for a harm

caused by the criminal act of a third person may lie where there is some special

relationship between the parties.  *See, Delahanty v. Hinckley,* 564 A.2d 758, 762

(D.C.1989).

### A.    The Defendant Is Not Immune from Suit and Can Not Rely on the Doctrine of Discretionary Function.

Defendant was negligent in placing Plaintiff in a Public Housing Project that was just

as violent and dangerous than the one they moved them out of for safety.  Defendant

knew or should have known that Barry Farms was a violent place for the Bests' and Mr.

Doy to live.  Defendant can not claim the protection of discretionary function to shield it

from placing the Bests and Mr. Doy in an environment that resulted in Willie Best being killed within two months of his arrival there.

   To determine whether a claim is barred by the discretionary function exception, a two-part test announced in *Berkovitz v. United States, supra*. must be applied.  First, the conduct at issue must be discretionary, involving an element of judgment or choice. *Id.* This element is not met "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" and the employee "has no rightful option but to adhere to the directive."  *Id.* If the act is not discretionary, the exception does not apply and the immunity does not attach.  Here, the act of placing the Bests and Mr. Doy was not discretionary.

   When Ms. Best was told she had to go to Barry Farms she declined due to her fear of the area. She had lived there before.  Exhibit 1 ¶ 23.  Indeed the Defendant knew or should have been known of the dangerousness of Barry Farms, particularly for witnesses, before it attempted to make accepting housing there part of the EWAP program.  *See*, Exhibit 3 *passim.*  Indeed, the process should have ended when Ms. Best declined the housing Cartwright Affidavit ¶ 11.  It is clear when a witness declines to accept EWAP assistance "he or she must sign a written declination form indicating that he or she understands the options given, the potential risk, and still declines to utilize these services." Cartwright Affidavit ¶ 11.

   Instead of Ms. Forrest accepting Ms. Best declination of the EWAP services as the EWAP Plan mandates, Ms. Forrest used her influence over Ms. Best, a frightened unsophisticated victim of a crime, to persuade Ms. Best to accept the HUD placement at Barry Farms.  Ms. Forrest had no authority to use her discretion to persuade Ms. Forest to

take something that she rejected.   Ms. Forrest repeated this scare tactic in an effort to

force Ms. Best to accept the housing at Barry Farms after Ms. Best went to inspect the

apartment.  All of this occurred on Nov. 2, 2004, and is corroborated by the Defendant's

own witness.  Cartwright Affidavit ¶ 17.  The Defendant's attachment 7 reflects that Ms.

Best signed the form accepting the unit on Nov. 3, 2004, not Nov. 2, 2004.  This is a clear

indication that Ms. Best rejected the unit on Nov. 2, 2004.   No social, economic, or

political policy is implicated in the decision of Ms. Forrest to pressure Ms. Best into

accepting the unit at Barry Farms.   This is simply an ordinary judgment made by Ms.

Forrest to carry out the mission of her employer and urge the Bests' into dangerous

Public Housing against their will.  Therefore, this Court should conclude that the

discretionary function exception should not be applied and deny the Defendant's Motion

to Dismiss and for Summary Judgment.

**B.     The Plaintiff Has Established a Special Relationship with the Defendant
under the *Orcan* Doctrine.**

The Defendant relies on *Orcan v. United States*, 117 F.3d 495 (C.A. 11 1997) for the

proposition that the discretionary function exception bars any action by the Bests.  We

strongly disagree.

In *Orcan* a woman brought the criminal activity of her boyfriend to the attention of the

United States.  He was arrested and brought to Court for a bond hearing.  The woman

made it known to the Assistant U.S. Attorney handling the case that she was afraid of the

defendant.  The AUSA chose not to inform the woman of what type of protection was

available from the government for witnesses.  The woman was later kidnapped and

almost killed. She then brought a Federal Tort Claims Action against the government.

The District Court dismissed the case concluding that the discretionary function exception to the Federal Torts Claims Act barred its jurisdiction of the woman's claim. The Court of Appeals however, reversed and remanded and concluded,

> "that the duty to inform does not involve considerations of public policy, we hold that **the discretionary function exception does not bar a cause of action based on Ochran's allegation that (AUSA) Daltuva negligently failed to discharge her duty to inform Ochran of available remedies against intimidation and harassment.** Id. at 117 F.3d at 495. (Emphasis supplied).

In support of its decision the Court noted that went on to hold,

### Special Relationship

> Ochran argues further that the discretionary function exception does not bar a cause of action alleging negligent failure to protect because AUSA Daltuva voluntarily assumed the duty to protect Ochran, thereby inducing Ochran's reliance. *See, e.g., Miller v. United States, 530 F.Supp. 611, 615 (E.D.Pa.1982)* ("[C]ourts have ... recognized that, where the government enters into a **special relationship** with an individual, the government may not have any discretion as to whether to protect that individual.... [T]he negligent performance of that duty [to protect] is not shielded by the discretionary function exception.") (footnote omitted); *Merced v. City of New York*, 856 F.Supp. 826, 831 (S.D.N.Y.1994)* ("The Government admits that it 'may have a legal duty to protect' if it 'voluntarily assumed or incurred that duty to a specific individual ....' ") (quoting *Piechowicz v. United States, 685 F.Supp. 486, 498 (D.Md.1988), aff'd, 885 F.2d 1207 (4th Cir.1989)).* According to Ochran, once Daltuva undertook to protect Ochran, she entered into a **special relationship** with Ochran and bound herself to discharge the duty with due care.  *See, e.g., Everton v. Willard, 468 So.2d 936, 938 (Fla.1985); of State Attorney v. Powell, 586 So.2d 1180, 1183 (Fla.Dist.Ct.App.1991).* Id. at page 505

Here, the Bests were victim/witnesses who had been to he USAODC for an assessment of risk based upon the threat to their safety. The USAODC agreed to move them out of their home to a hotel for safety. The government did not do this in *Orcan* but the Court of Appeals found that the connection between the witness and the government in *Orcan* was special. The Court declined to allow the government to defend against the

10

FTCA claim using the discretionary function exception. Id. At 506. This case truly involves a special relationship between the government and the Bests. It is axiomatic that once the government writes the Bests offering protection, if it is sought, and the Bests' rely upon the offer and are assessed and moved outside of the zone of danger (their neighborhood) by the government at the government's expense, a special relationship is spawned and the government can not avail themselves of the discretionary function exception.[2]

Therefore, the Plaintiff has alleged a claim upon which relief can be granted and there is a genuine issue of fact that requires the denial of the Defendant's Motion for Summary Judgment.

C.    **The Government Can Be Treated as a Private Citizen**.

When the government placed the Bests' in Barry Farms it did so knowing that it was foreseeable that they could be injured by third parties. Since the defendant had a special relationship with the Bests', as protected witnesses, and the Defendant knew or should have known of the danger of placing them in the Barry Farms Public Housing, they had a duty not unlike any private entity. In situations such as this Federal Courts must look to the local jurisdiction and apply its law.

In The District of Columbia the law on this type liability requires that the injured party show a **special relationship** between itself and the actor. Here, it is beyond peradventure that the Defendant had a special relationship with the Bests' for their protection. When the Defendant forced the Bests into Barry Farms, knowing that it was a violent and

---

[2] The Defendant also relies upon the District Court's ruling in Shuler v. United States, Memorandum Opinion of Judge Urbina, District Judge, 8/21/2006. Shuler involved a witness who never had any formal relationship with Government and, unlike the instant case, there was no showing of any statutory basis for the government to take a specific course of action.

dangerous place it accepted responsibility for any reasonable foreseeable, criminal acts of

third parties against the Bests, which is actionable under well established D.C. law.   In

*Delahanty v. Hickey*, 564 A.2d 758, 762 (D.C. 1989) the Court found:

> "In general no liability exists in tort for harm resulting from the criminal acts of third parties, although liability for such harm sometimes may be imposed on the basis of some special relationship between the parties." *Hall v. Ford Enterprises, Ltd.,* 445 A.2d 610, 611 (D.C.1982); *see also Kline v. 1500 Massachusetts Ave. Apartment Corp.,* 141 U.S.App.D.C. 370, 375-76, 439 F.2d 477, 482-83 (1970) (relationships giving rise to a duty of protection include landlord to tenant, school district to student, employer to employee, and hospital to patient); *District of Columbia v. Doe,* 524 A.2d 30, 32 (D.C.1987) (school to student). We are not inclined to extend the rationale of these decisions to the present case. Appellants have alleged no special relationship with the gun manufacturers and have suggested no reasonable way that gun manufacturers could screen the purchasers of their guns to prevent criminal misuse.

This court can therefore place the government in the shoes of a private

citizen given the special relationship the Bests' had with the Defendant and the

foreseeability of the danger the government negligently placed them in.

Therefore, the Plaintiff has alleged a claim upon which relief can be granted and

there is a genuine issue of fact that requires the denial of the Defendant's Motion for

Summary Judgment.

### D.    CONCLUSION

The facts of this case do not support the exercise of the discretionary function immunity defense because, pursuant to the two step analysis first established in *Berkovitz v. United States*, 48 U.S. 531 (1988). As such, Plaintiff's complaint states a claim upon which relief can be granted. In addition, there are genuine issues of material fact that require the denial of the Defendant's Motion for Summary Judgment. See, *Celotex Corp v. Catrett,* 477 U.S.317, 323 (1986).

Wherefore, Defendant's Motions should be denied.

Respectfully submitted,
Deloris Best

s/_____
Kenneth D. Bynum
DC Bar No.: 424515

s/_____
Ronald Dixon
DC Bar No.: 954628
Bynum and Jenkins, PLLC
901 North Pitt Street, Suite 320
Alexandria, VA 22314

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT I Served a copy of the Plaintiff's Opposition to the Defendant's Motion to Dismiss or for Summary Judgment by First Class Mail, Postage Prepaid this 4th Day of June 2007 to: Darryl Valdez, Assistant United States Attorney, The United States Attorneys Office, 555 4th Street, NW, Washington, DC 20001.

s/_____
Kenneth D. Bynum

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Dolores Best, Executrix of the Estate )
of Willie Best, Deceased )
)
     Plaintiff )
)
     v. )     Civil Action No.: 2007 CA 00007
)     Judge (PLF)
United States of America )
)
)
     Defendant. )

**PLAINTIFF'S STATEMENT OF FACTS AS TO WHICH
THERE IS A GENUINE ISSUE**

Comes now, Plaintiff, Deloris Best, Executor for the Estate of Willie Best, by

counsel, Kenneth D. Bynum and Ronald Dixon of Bynum and Jenkins, PLLC, and

respectfully states the following Facts as to Which There is a Genuine Issue.

1.     Plaintiff does not dispute Defendant's Statement in paragraph 1 of it

Statement of Material Facts.

2.     Plaintiff disputes paragraph 2 of its Statement of Material Facts and

states as follows:  the Bests' did not feel safe in the Lincoln Heights

Housing projects because people in the neighborhood knew they

reported he robbery to the police. The Bests' knew that the would be

labeled snitches and would be in danger because they went to the

police. *See,* Best Aff. at paragraph 9. The Bests' came to find out that

the friends of the suspects knew where they were in Barry Farms and

were in contact with people who lived in Barry Farms. The suspects

contacts were beyond the Northeast quadrant of the City and extended

to the Southeast quadrant of the City. *See*, Best Aff. at paragraph  41
and Doy  Aff. at paragraph 41.

3.      Plaintiff disputes that the HUD program was part of EWAP. *See,* Aff.
of Cartwright, page 14.

4.      Plaintiff disputes the facts. The decision to place the Bests at Barry
Farms was made over the objection of Plaintiffs. The Bests were told
by Ms. Forrest, the WSS, that they had no choice and had to take an
apartment in Barry Farms or go back to Lincoln Heights. A decision
was made to place the Bests in the Emergency Witness  Assistance
Program (EWAP), but that placement was for the time the Bests were
living in a hotel and receiving EWAP funds. The receipt of EWAP
funds did not include the Bests moving into public housing. *See*,  Aff.
of Cartwright at page 14. Ms. Forrest also discussed the possibility of
emergency lodging pursuant to EWAP program while the family
waited for the HUD Relocation process to be finalized.  Plaintiff
disputes that the EWAP program include placing the Best in public
housing. *See*, Cartwright Aff. Paragraph 14. The EWAP form that the
Bests' signed said nothing about providing housing with HUD or in
Barry Farms. *See*, Attachment 6.

5.      Plaintiff disputes that the EWAP program does not provide protection
for the Bests. When the Bests were placed in hotels within the power
of EWAP they were told that it was for their safety. *See*, Best and Doy
Aff. at paragraphs 44 and 49, respectfully.

6.        Plaintiff agrees with AUSA Frenzen that the Best would have been in danger had they stayed in public housing in Lincoln Heights. The Plaintiff disputes the Defendant's statement that they were placed in temporary housing pursuant to EWAP while waiting for public housing. *See*, Aff. Of Best and Doy at paragraphs 44 and 49, respectively. Best and Doy did not want to return to Lincoln Heights or Barry Farms. *See*, Aff. of Best and Doy at paragraphs 28 and 30-31, respectively.

7.        The Plaintiff disputes the Defendant's statement that on November 2, 2004 Ms. Best was informed that Ms Forest had obtained an apartment for her in Barry Farms. Ms. Best objected to this, but was told by Forrest that she had no choice. She would have to take Barry Farms or return to Lincoln Heights. *See*, Aff. of Best and Doy at paragraphs 28 and 30-31 and 39, respectively.

8.        The Plaintiff dispute the Defendants claims that Ms. Best did not want the apartment in Barry Farms because the closets were too small. Ms Best did not want the apartment because it was in a dangerous area of the City. *See*, Aff. of Best and Doy at paragraphs 26 and 28, respectively. *See*, Aff. of Willie Toland, *passim*, it was well known to the Defendant and the local law enforcement community that both Lincoln Heights and Barry Farms were areas of high levels of crime and were designated a hot spots for crime in 2002, 2003 and 2004. Ms. Best was told by Ms. Forest that she had no choice and must accept

this apartment or return to Lincoln Heights. Ms. Forest said she could put her on the back side of Lincoln Heights. *See*, Aff of Best and Day at paragraph 28. When Ms. Best rejected the apartment in Barry Farms on November 2, 2004, Ms. Forrest did not present Ms. Best with a Declination of EWAP services. *See*, Aff. of Best and Day at paragraphs 32 and 38, respectively and Aff. of Cartwright at page 11.

9.     The Plaintiff disputes Willie Best was not listed as an occupant in the lease for the unit 8.  Ms. Forest was aware that Willie Best and Anthony Best would be living with Ms. Best in Barry Farms. *See*, Aff. of Best and Doy at paragraphs 46 and 45, respectively and Aff. of Cartwright at paragraph 14.

10.     Plaintiff disputes the Defendant that the suspects were merely held. The suspects, at the government's request, were held pursuant to DC Code § 1322 (b) (1)(A),  the pre-trial detention statute for dangerousness.

Wherefore, Defendant's Motion should be denied.

                                        Respectfully submitted,
                                        Deloris Best

s/_____
Kenneth D. Bynum
DC Bar No.: 424515
s/_____
Ronald Dixon
DC Bar No.: 954628
Bynum and Jenkins, PLLC
901 North Pitt Street, Suite 320
Alexandria, VA 22314

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Dolores Best, Executrix of the Estate )
of Willie Best, Deceased )
)
      Plaintiff )
)
      v. )      Civil Action No.: 2007 CA 00007
)
United States of America )
)
)
      Defendant. )

**ORDER**

This matter came before the court upon the Defendant, United States of America's Motion to Dismiss and or for Summary Judgment and the Plaintiff's Opposition thereto. Premises considered, the Plaintiff has stated a claim upon which relief can be granted, and there are genuine issues of material fact that require the denial of the motion for summary judgment.

IT IS HEREBY ORDERED that the Motion to Dismiss and the Motion for Summary Judgment are HEREBY DENIED this _____ day of  2007.

_____
Paul F. Friedman
US District Judge

**AFFIDAVIT**

I, Deloris Best, being over the age of 18, do hereby swear as follows:

1. On September 12, 2004 I was living at 219 51st Street NE, #22, known as Lincoln Heights Public Housing Complex with my two adult sons Willie Best, Anthony Wright, and my boyfriend Ronald Doy.

2. On that date September 12, 2004 at about 8:00 p.m. two men forced their way into our unit and pointed a pistol in the direction of Mr. Doy and Willie Best and demanded money. They eventually left.

3. Mr. Doy, my sons, and I witnessed the incident.

4. I called the police immediately after they left.

5. The police came and I gave a description of what happened to officer Whaley.

6. We later met with Detective Steve McDonald of the Metropolitan Police Department.

7. During our meeting with Detective McDonald, we told him we were afraid to remain in Lincoln Heights.

8. When the police came to our apartment to talk with us about the robbery our neighbors were aware that we talked to them.

9. At that time I knew that people in our neighborhood who reported crimes to the police were called "snitches."

10. My sons, Mr. Doy, and I knew that people in the neighborhood who were thought to be snitches were often threatened and sometimes harmed.

11. After we told Det. McDonald about our fear about remaining in the neighborhood, we were taken to meet Ms. Forrest, in the U.S. Attorney's Office.

12. After I met Ms. Forrest I learned that she was a person who helped witnesses and victims of crime.

13. My sons, Mr. Doy and I told Ms. Forrest that we were afraid to remain in Lincoln Heights, because our neighbors knew we had gone to the police about the robbery and we were afraid that we would be hurt because of that.

14. We told Ms. Forrest we feared for our safety if we stayed at Lincoln Heights.

15. After meeting with Ms. Forrest for one hour, we were told to pack an overnight bag and we were transported to the Washington Suites Hotel on Duke Street in Alexandria, Virginia. Ms. Forrest provided us with money, for food and transportation.

16. Ms. Forrest made arrangements to pay our bill at the hotel.

17. We stayed in the hotel in Alexandria for approximately one month.

18. On or about October 6, 2004 I was advised by members of the police department that the second robber had been arrested.

19. We appeared before the Grand Jury during this time period.

20. We were later moved into the Blair House Apartments in Silver Spring, MD.

21. Ms. Forrest provided us with meal and transportation money and made payments directly to the Blair House to cover the rent.

22. On November 2, 2004 I received a telephone call from Ms. Forrest and she told me that she had found a place for me in Barry Farms, a Public Housing Complex in South East Washington D.C.

23. I told Ms. Forrest that I did not want to return to Barry Farms because it was dangerous and I was afraid for myself and my family.

24. In 1972-1989 my sons, Mr. Doy and I lived in Barry Farms in a house at 1141 Eaton Road, S.E. Washington, D.C.

25. That address is ½ block away from 1249 Eaton Road SE #101, where we currently live.

26. When we lived in Barry Farms from 1972-1989 there was gunfire, drug selling, murders, and I was afraid for my safety and my family's safety.

27. We moved out of Barry Farms in February 1989 but I kept in contact with people who lived there and I was told that Barry Farms did not get better it got worse.

28. After I told Ms. Forrest why I didn't want to return to Barry Farms she said "you do not have a choice, you can go to Barry Farms or go back to Lincoln Heights."

29. At all times I thought Ms. Forrest had control over Public Housing.

30. Ms. Forrest said that if I did not want Barry Farms she would put me on "the backside of Lincoln Heights."

31. I did not want to return to Lincoln Heights under any circumstances.

32. After I told Ms. Forrest, I did not want to go to Barry Farms I did not receive from Ms. Forrest or anyone in Ms. Forrest's office any form or paper to sign showing that I declined the Emergency Witness Assistance Housing.

33. I felt I had no choice so on November 2, 2004 Mr. Doy and I went to look at the apartment in Barry Farms.

34. After looking at the apartment I told the person in the rental office that I did not want it.

35. After I stated I did not want the apartment we left.

36. I returned to the Blair House and called Ms. Forrest.

37. I told Ms. Forrest I did not accept the apartment.

38. After I told Ms. Forrest the second time I did not want to go to Barry Farms and I did not accept the apartment I did not receive from Ms. Forrest or anyone in Ms. Forrest office any form or paper to sign showing that I declined the Emergency Witness Assistance Housing.

39. She told me again I did not have a choice and I had to accept the apartment in Barry Farms.

40. On November 3, 2004 I returned to Barry Farms and accepted the apartment that I was shown on November 2, 2004.

41. A few days after we moved into Barry Farms I saw and recognized a group of maintenance workers who I also knew worked in Lincoln Heights.

42. These workers also recognized Mr. Doy and me.

43. A short time later I was informed that the maintenance people were telling people at Lincoln Heights that we were in Barry Farms.

44. I was told by Ms. Forrest that the placement in hotels was for our safety.

45. I was told by Ms. Forrest that moving us out of Lincoln Heights was for our safety.

46. Ms. Forrest knew when she sent me to Barry Farms that Willie and Anthony Best would be living with me.

47. At all times I believed Ms. Forrest had the authority to place us in public housing.

48. On January 8, 2005 in the mid afternoon I heard the sound of a gunshot outside my apartment door.

49. Upon opening the door I saw my son Willie at the front of the door being shot by a hooded man.

50. I asked the hooded man not to shoot anymore as he had already shot Willie once.

51. The Man then left and I consoled my son, and asked a neighbor to call the police.

52. On the next day I called Ms. Forrest and told her that Willie had been shot and killed. She became very upset and sounded like she was crying.

PERSONALLY APPEARED BEFROE ME THIS 30TH DAY OF MAY 2007.

_Delois Beg_

NOTARY PUBLIC: _D. Ann T. Dix_

My commission expires: _5·31·2010_



SEAL

EXHIBIT 2

L-STATE LEGAL®

# AFFIDAVIT

I, Ronald E. Doy, being over the age of 18, do hereby swear as follows:

1. On September 12, 2004 I was living at 219 51st Street NE, #22, known as Lincoln Heights Public Housing Complex with Willie Best, Anthony Wright, and my girlfriend Deloris Best.

2. On that date September 12, 2004 at about 8:00 p.m. two men forced their way into our unit and pointed a pistol in the direction of Willie Best and me and demanded money. They eventually left.

3. Mr. Best, Willie Best, Anthony Best, and I witnessed the incident.

4. Ms. Best called the police immediately after they left.

5. The police came and Ms. Best gave a description of what happened to officer Whaley.

6. We later met with Detective Steve McDonald of the Metropolitan Police Department.

7. During our meeting with Detective McDonald, we told him we were afraid to remain in Lincoln Heights.

8. When the police came to our apartment to talk with us about the robbery our neighbors were aware that we talked to them.

9. At that time I knew that people in our neighborhood who reported crimes to the police were called "snitches."

10. Ms. Best, Willie Best, Anthony Best and I knew that people in the neighborhood who were thought to be snitches were often threatened and sometimes harmed.

11. After we told Det. McDonald about our fear about remaining in the neighborhood, we were taken to meet Ms. Forrest, in the U.S. Attorney's Office.

12. After I met Ms. Forrest I learned that she was a person who helped witnesses and victims of crime.

13. Ms. Best, Willie Best, Anthony Best and I told Ms. Forrest that we were afraid to remain in Lincoln Heights, because our neighbors knew we had gone to the police about the robbery and we were afraid that we would be hurt because of that.

14. We told Ms. Forrest we feared for our safety if we stayed at Lincoln Heights.

15. After meeting with Ms. Forrest for one hour, we were told to pack an overnight bag and we were transported to the Washington Suites Hotel on Duke Street in Alexandria, Virginia, Ms. Forrest provided us with money, for food and transportation.

16. Ms. Forrest made arrangements to pay our bill at the hotel.

17. We stayed in the hotel in Alexandria for approximately one month.

18. On or about October 6, 2004 we were advised by members of the police department that the second robber had been arrested.

19. We went to the Grand Jury during this time period. I did not testify.

20. We were later moved into the Blair House Apartments in Silver Spring, MD.

21. Ms. Forrest provided us with meal and transportation money and made payments directly to the Blair House to cover the rent.

22. On November 2, 2004 Ms. Best received a telephone call from Ms. Forrest and Ms. Best she told me that Ms. Forrest had found a place for us in Barry Farms, a Public Housing Complex in South East Washington D.C.

23. I told Ms. Forrest that I did not want to return to Barry Farms because it was dangerous and I was afraid for myself and the Best family.

24. In 1972-1989 my sons, Ms. Best, her sons, and I lived in Barry Farms in a house at 1141 Eaton Road, S.E. Washington, D.C.

25. That address is ½ blocks away from 1249 Eaton Road SE #101, where we currently live.

26. When we lived in Barry Farms from 1972-1989 there was gunfire, drug selling, murders, and I was afraid for my safety and my family's safety.

27. We moved out of Barry Farms in February 1989 but I kept in contact with people who lived there and I was told that Barry Farms did not get better it got worse.

28. I heard Ms. Best tell Ms. Forrest why she didn't want to return to Barry Farms she said "you do not have a choice, you can go to Barry Farms or go back to Lincoln Heights."

29. At all times I thought Ms. Forrest had control over Public Housing.

30. I heard Ms. Best tell Ms. Forrest that if she did not want Barry Farms she would put me on "the backside of Lincoln Heights."

31. We did not want to return to Lincoln Heights under any circumstances.

32. After Ms. Best told Ms. Forrest, she did not want to go to Barry Farms she did not receive from Ms. Forrest or anyone in Ms. Forrest's office any form or paper to sign showing that she declined the Emergency Witness Assistance Housing.

33. We felt we had no choice so on November 2, 2004 Ms. Best and I went to look at the apartment in Barry Farms.

34. After looking at the apartment I heard Ms. Best tell the person in the rental office that she did not want it.

35. After Ms. Best stated she did not want the apartment we left.

36. We returned to the Blair House and Ms. Best called Ms. Forrest.

37. I heard Ms. Best tell Ms. Forrest she did not accept the apartment.

38. After Ms. Best told Ms. Forrest the second time she did not want to go to Barry Farms and she did not accept the apartment she did not receive from Ms. Forrest or anyone in Ms. Forrest office any form or paper to sign showing that she declined the Emergency Witness Assistance Housing.

39. On November 3, 2004 we returned to Barry Farms and accepted the apartment that we were was shown on November 2, 2004.

40. A few days after we moved into Barry Farms I saw and recognized a group of maintenance workers who I also knew worked in Lincoln Heights.

41. These workers also recognized Ms. Best and me.

42. A short time later I was informed that the maintenance people were telling people at Lincoln Heights that we were in Barry Farms.

43. I was told by Ms. Forrest that the placement in hotels was for our safety.

44. I was told by Ms. Forrest that moving us out of Lincoln Heights was for our safety.

45. Ms. Forrest knew when she us to Barry Farms that Willie and Anthony Best would be

living with us.

46. At all times I believed Ms. Forrest had the authority to place us in public housing.

PERSONALLY APPEARED BEFROE ME THIS 30TH DAY OF MAY 2007.

NOTARY PUBLIC: _____

My commission expires:     5 - 31 - 2010

SEAL



DI ANN T. DIX
NOTARY PUBLIC
MY COMMISSION
EXPIRES
5/31/10
COMMONWEALTH OF VIRGINIA


EXHIBIT
3
ALL-STATE LEGAL®

# AFFIDAVIT

I, Willie G. Toland, being over the age of 18, do hereby swear as follows:

1. From June 27, 1975 until October 2, 2004 I was a sworn member of the Metropolitan Police Department.

2. I worked as a uniformed officer patrolling the streets of the District of Columbia and had various assignments before becoming an Investigator, Detective II and Detective I.

3. I learned the crime trends in the District of Columbia and the efforts of the Metropolitan Police Department to combat these crime trends.

4. I participated in numerous briefings, arrests, intelligence sessions, training programs sponsored by the Metropolitan Police Department and other agencies on criminal investigation.

5. I worked in the 6th Police District and had experience with the Public Housing Project known as Lincoln Heights, which is in the 6th Police District, and the criminal culture there.

6. I worked at the 7th Police District and had experience with the Public Housing Project known as Barry Farms, which is in the 7th Police District, and the criminal culture there.

7. I have interviewed well over 1000 people including witnesses to crime and people charged with crimes to include drug distribution, burglary, unauthorized use of motor vehicle, assault, robbery armed robbery, rape and murder.

8. I have made arrests of people who have been prosecuted by the Office of the United States Attorney for the District of Columbia (USAODC)

9. I have become familiar with the programs made available through the USAODC for victim/witness assistance.

10. I have had the opportunity to sponsor witnesses for assistance from the victim witness unit of the USAODC.

11. I am aware of the process by which victim/witnesses are assisted by the victim witness unit of the USAODC.

12. I have discussed with members of the USAODC victim/witness unit staff the level of crime in Lincoln Heights and Barry Farms Public Housing Projects on several occasions.

13. As a general matter members of the USAODC are aware of the high level of crime that plagued Lincoln Heights and Barry Farms Public Housing Projects in 2002, 2003, and 2004.

14. I am aware that victims/witnesses who come forward to assist the police and the prosecution are often threatened or harmed when their identities becomes known or suspected by criminal elements who label them "snitches."

15. I am aware that Lincoln Heights and Barry Farms Public Housing Projects in 2002, 2003, 2004 were designated hot spots or high crime areas.

16. This designation of Lincoln Heights and Barry Farms was shared by the USAODC.

17. During my tenure with the Metropolitan Police Department I have discussed the crime trends in the Lincoln Heights and Barry Farms Public Housing Projects with other police officers who patrol those areas and agree that Lincoln Heights and Barry Farms have a reputation as high crime areas.

18. I do not know the Best family and I have no knowledge of any facts surrounding any case that they may have been witnesses in.

PERSONALLY APPEARED BEFROE ME THIS 4th DAY OF JUNE 2007.

NOTARY PUBLIC: _____

My commission expires:   5·31· 2010



SEAL

2

EXHIBIT 4

ALL-STATE LEGAL®

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION

UNITED STATES

vs.

Duane Blunt

On Sunday, September 12, 2004, at approximately 2009 hours, I Officer Whaley of the Metropolitan Police Department received a radio run for two men with guns in front of 219 51st Street, Northeast, Washington DC. Upon arrival on the scene, myself and other officers were met by C-1 and C-2. C-1 stated that he had been robbed at gunpoint and struck over the head with a handgun. Officers observed a contusion on the back of C-1's head. C-1 refused medical treatment. C-2 stated that he was assaulted with a handgun and forced into his apartment.

C-1 was interviewed and states that he was in front of 219 51st Street, Northeast when he was approached by two black males. C-1 states that one of the black male subjects was heavy set (S-1) and the other black male subject had tear drop tattoos under his eyes (S-2). C-1 states that S-1 stuck a silver in color semi-automatic pistol in his side. C-1 states that he removed nine dollars in U.S. Currency and a pocket knife from his pants pockets and placed the items on a brick ledge where S-2 retrieved the items.

C-1 states that C-2 then came out of apartment #22 on the second floor and was approached by S-1 who followed C-2 back into the apartment. C-1 states that S-2 then started to lead him up the stairs towards the apartment door while continuing to demand money. C-1 states that S-2 then struck him on the head with the handgun.

C-2 was interviewed and states that he came out of apartment #22 and observed S-1 who he identified as "Dee" and S-2 who he identified as "Blunt", both armed with handguns and standing on either side of C-1. C-2 states that he attempted to flee back into apartment #22 and was pursued inside of the apartment by "Dee". C-2 states that once inside of the apartment, "Dee" grabbed his shirt and placed the handgun to his head and demanded money. C-2 states that he continued to tell "Dee" that there was no money. C-2 states that both subjects then left the apartment. C-2 stated that he knew both subjects from the Lincoln Heights area adn sees both of them on a regular basis. C-2 added that the subject known to him as "Blunt" has distinctive tear drop tattoos under both eyes.

Witness #1 was interviewed and states that she was inside of 219 51st Street, Northeast, Apartment #22. Witness #1 states that she heard C-2 call out for her. Witness #1 states that she opened the door to her bedroom and observed a heavy set black male subject pointing a handgun at C-2's head. Witness #1 states that she observed another black male subject in the living room.

The events and acts described above occurred primarily in the District of Columbia and were committed as described by defendant(s) listed in the case caption

Subscribed and sworn before me this    15    Day of    Sept    2004

Police Officer

Badge    2558

District    60

Clerk Superior Court of the
District of Columbia

By: _____
Deputy Clerk

TEST: MAY 2 5 2007

Deputy Clerk

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION

UNITED STATES

vs.

Duane Blunt

| 1-COMPLAINT NUMBER | | 2-ARREST NUMBER |
|---|---|---|
| 3-UNIT OR DIST. | | |

METROPOLITAN POLICE DEPARTMENT
WASHINGTON, D.C.
CONTINUATION REPORT
FOR USE WITH PD179 AND PD163 ONLY

PD 202A
REV. 8/71

CONTINUED STATEMENT OF FACTS:
area of the apartment with a gun in his hand. Witness #1 states that both of the armed subject were yelling "Where's the money".

Based on the description given for S-2 "Blunt", Duane Blunt PDID#487513 was developed as one of the suspects in this case.

On September 14, 2004, C-2 was shown a photospread consisting of nine MPD color photographs. C-2 viewed all nine photographs and then pointed to the photograph of the defendant, Duane Blunt PDID#487573 and stated, "you already know him, on there, that's him, the one that hit my brother".

On the same date, Witness #1 was also shown a photospread consisting of nine MPD color photographs. Witness #1 viewed all nine photographs and then pointed to the photograph of the defendant, Duane Blunt PDID#487573 and stated, "This one here, he's the second one that came in the apartment with a gun at my sons head".

On 9-14-2004, at approximately 2030 hours, Officers Whaley and Vigil were on routine patrol in the 200 block of 50th Street Northeast. Officers observed the defendant standing in the courtyard area and made a probable cause arrest of the defendant. The defendant was transported to the Sixth District and processed.

A TRUE COPY
TEST:  MAY 2 5 2007
Clerk Superior Court of the
District of Columbia
By: _____
           Deputy Clerk

The events and acts described above occurred primarily in the District of Columbia and were committed as described by defendant(s) listed in the case caption

Subscribed and sworn before me this  15  Day of  Sept  200 4

_____
Police Officer

2558
Badge

60
District

_____
Deputy Clerk



**U.S. Department of Justice**

United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20530*

September 17, 2004

Case:   U.S. v. DUANE  BLUNT
PDID No:   0487513
Case Number:  F0578504
Filed On:   September 15, 2004

Willie Best
219 51st Street, NE Apt. 22
Washington, DC

Dear Willie Best::

This letter is being sent to you automatically by computer because you were listed in law enforcement records as a victim (or the representative of a victim) of a crime. You are entitled by law to receive information about this case. The defendant was charged with ARMED ROBBERY.

The prosecutor currently assigned to this case is Assistant United States Attorney (AUSA) William Frentzen, who can be reached at (202) 514-7585. It is possible for this prosecutor to be replaced by other prosecutors as the case progresses through the criminal justice system. You will be notified if a new prosecutor is assigned to this case. Please keep this information nearby when you ask questions about the case because this information will be extremely useful to those trying to help you.

The next court hearing in this case will be a(n) PRELIMINARY HEARING currently scheduled for September 22, 2004. Frequently, court hearing dates are scheduled or changed on short notice. If the hearing mentioned in this paragraph has already occurred, you soon should receive notice of the next scheduled hearing. Because court hearing dates are changed frequently, you should not rely only on the information in this letter about when hearings will occur. You are NOT required to attend hearings in this case unless you receive a subpoena. However, if you are not scheduled to be a trial witness, you often are permitted to observe court hearings. If you choose to attend hearings, please introduce yourself to the AUSA in the courtroom. This will give the AUSA an opportunity to discuss the case with you, if necessary, and to ensure that you are permitted to observe the court proceedings. If you have any questions about whether the hearing will occur as scheduled or whether to attend, please contact the United States Attorney's Office at the phone number listed above.

The defendant was held in jail. Please be advised that this is not the final decision about whether the defendant should be released. A defendant's initial release/detention status may change! You should call the D.C. Department of Corrections Victim Information and Notification Everyday (VINE) service at 1-877-329-7894 for the most current information on a defendant's release/detention status. You can also register with VINE so that you will be notified if the defendant's status changes.

Please turn over for more information on Victims' Rights.

Page 2

The Superior Court of the District of Columbia is located at 500 Indiana Avenue, NW. The United States Attorney's Office is located at 555 4th Street, NW. The closest Metro stop for both buildings is the Judiciary Square Metro stop, on the Red Line.

While this case is pending, you may be contacted either by telephone or in person by individuals wishing to discuss the case with you. Please be aware that you are under no obligation to discuss this matter with anyone outside of an official court proceeding. In deciding whether to discuss this matter with any individual who may contact you, you should make sure that you know their proper identity as well as the nature of their interest in the case.

Victims of violent crime may be eligible for payments to help with certain crime-related expenses. For information please call the Crime Victims Compensation Program at 202-879-4216. Staff is available to assist victims of violent crime who need help in completing an application. Victims of non-violent crimes are not eligible for assistance from the Crime Victims Compensation Program.

If the case number on the front of this letter begins with the letter "M", the defendant is charged with a misdemeanor. If you are the victim of a misdemeanor case, you may be offered the opportunity to resolve this case by mediation instead of by going to court. Mediation is NOT available in misdemeanor Domestic Violence cases. If you choose to participate in mediation, regardless of the outcome of the mediation, you will remain entitled to the same services that you would have been entitled to had you chosen to go to court instead of mediation.

Under federal laws and regulations, we are required to notify all victims about the services available to them. These services include:

1.   Referrals for social services, and medical or mental health assistance.

2.   Obtaining a court interpreter if you do not speak English and are required to testify.

3.   Making arrangements for your travel and accommodations if you live outside the Washington, DC area and are required to testify.

4.   Victim advocacy, including assistance in completing a Victim Impact Statement and an application for Crime Victims Compensation.

5.   Providing you with information about witness assistance and protection, and arranging for reasonable witness assistance or protection if you are threatened, harassed or intimidated because of your involvement in this case.

The United States Attorney's Office Victim Witness Assistance Unit can assist you with many of your needs. During business hours, call 202-514-7130 or the assigned attorney with any questions or concerns you may have about your role in this case. If you have an emergency, call 911 and talk to the police.

Sincerely,

The United States Attorney's Office

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CRIMINAL DIVISION - FELONY BRANCH

UNITED STATES OF AMERICA    :
                            :    Criminal No. F-5785-04
         v.                 :    Judge Wendell P. Gardner, Jr.
                            :    Felony Status Conf. 11/19/04
DUANE BLUNT                 :    Courtroom 111 @ 9:30 a.m.

FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER OF DETENTION PENDING TRIAL

This matter came before the Court for a Preliminary Hearing on September 22, 2004, the government having previously moved that the defendant be preventively detained pursuant to D.C. Code § 23-1322 (b)(1)(A) for committing Armed Robbery, a dangerous and violent crime. Having considered the factors enumerated in D.C. Code § 23-1322 (e), the nature and circumstances of the offense charged, the Government's proffer of the defendant's prior record and indicia of dangerousness to the community, the testimony of Metropolitan Police Officer Kevin Whaley, the arguments of counsel for both the defendant and the government, and the report and recommendation of Pretrial Services Agency, in accordance with D.C. Code § 23-1322 (g)(1), the Court makes the following findings of fact and conclusions of law:

1. There is substantial probability to believe that the defendant committed the offense for which he is before the Court, that is, Armed Robbery, a dangerous crime and a crime of violence, as defined in D.C. Code §§ 23-1331 (3)(G) and (4)(N).



The evidence presented at the defendant's Preliminary Hearing established that the offense occurred on September 12, 2004, at approximately 8:09 p.m.

Officer Whaley and his partner received a radio run for a robbery involving two armed men fleeing the event at 219 51st Street, N.E., Washington, DC. Upon arriving, the officers found two complainants and two witnesses to the events. Complainant 1 stated that he was standing on the sidewalk in front of the above-mentioned location when two men approached him and demanded money.[1] Both individuals had guns. Complainant 1 described defendant Blunt as having teardrop tattoos on his face. Complainant 1 removed nine (9) dollars in U.S. currency and a pocket knife from his pant pocket and placed them on a ledge, from where the gunmen removed the items. Complainant 2 was coming downstairs when this incident occurred and saw both men with guns drawn on Complainant 1. He was chased back upstairs by the second unknown suspect. He ran into apartment number 22, and was followed by the unidentified suspect.

Complainant 1 went up the stairs towards the apartment and was struck on the head from behind by the individual identified as defendant Blunt, who followed to the door of the apartment. Complainant 2

Witnesses 1 and 2 were inside the apartment.

---

[1] Complaint 1 had been drinking during the course of the day and Officer Whaley could tell that he was intoxicated.

recognized defendant Blunt from seeing him in the neighborhood frequently and told Officer Whaley that he knew of him as "Blunt," and provided a description. Officer Whaley knew of defendant Blunt and prepared a photospread showing defendant Blunt and eight other individuals. The photospread was shown to Complainant 2 and Witness 1. Both picked out and identified defendant Blunt as the man they had seen during the incident.

2. In determining whether there are conditions of release that will reasonably assure the safety of any other person or the community, the Court has considered the following factors:

a. The nature and circumstances of the offense charged, which as previously described, is a dangerous crime and a crime of violence as defined respectively in D.C. Code §§ 23-1331 (3)(G) and (4)(N). Here there is substantial probability to believe that the defendant committed the crime of Armed Robbery with a pistol. Consequently, there is a rebuttable presumption of the defendant's dangerousness pursuant to D.C. Code § 23-1322(c)(1) that remains unrebutted.

b. The weight of the uncontradicted evidence against the defendant is strong, as evidenced by the facts and circumstances found above.

c. The characteristics and criminal history of the defendant reflect a twenty-six year-old unemployed male resident of Washington, D.C. with no income or liquid assets. The

3

defendant has had two prior convictions in the District of Columbia: one in traffic case T-00762-99 for Operating a Vehicle while Permit Suspended and one in traffic case T-03182-98 for Operating a Vehicle while Intoxicated. In case T-00762-99, the defendant was placed on probation, which was revoked to incarceration on April 27, 2000. Additionally, in case T-03182-98 the defendant was placed on probation, which terminated unsuccessfully on August 2, 1999.

d.    The nature and seriousness of the danger to another person or the community that would be posed by the defendant's release is evidenced by the circumstances and facts found above. The Court has found that there is substantial probability to believe that the victim was robbed by the defendant while armed with a pistol.

**WHEREFORE**, having considered the provisions of D.C. Code § 23-1322, and the factors set forth in D.C. Code § 23-1322 (e), this Court finds by substantial probability that the defendant committed the dangerous crime and crime of violence of Armed Robbery. Furthermore, by clear and convincing evidence, the Court finds that there is no condition or combination of conditions, as set forth in D.C. Code § 23-1321 (c), which will reasonably assure the safety of any other person or the community.

4

Therefore, it is this **11th** day of November, 2004,

**ORDERED** that Duane Blunt be held without bond for trial or other final disposition of his case pursuant to D.C. Code § 23-1322 (b)(1)(A) for a period not to exceed one hundred (100) days which commenced on September 15, 2004, and ends December 23, 2004; unless the one hundred (100) day period is waived or good cause for an extension thereof for any additional twenty (20) day periods is found; and it is

**FURTHER ORDERED**, that the Defendant be committed to the custody of the Attorney General of the United States for confinement in a facility separate, to the extent practicable, from persons awaiting or serving sentences or being held pending appeal; that the Defendant be afforded a reasonable opportunity for private consultation with counsel; and, that on order of a judicial officer or request of an attorney for the government, the Defendant be delivered to the United States Marshal or other appropriate person for appearance in a court proceeding.

_____
JUDGE WENDELL P. GARDNER, JR.
(Signed in Chambers)

A TRUE COPY
TEST: MAY 2 3 2007
Clerk Superior Court of the
District of Columbia
By: _____
Deputy Clerk

5

**copies to:**

William Frentzen, AUSA
United States Attorney's Office
555 Fourth Street, N.W.
Washington, DC 20530

Dehlia Aghadiuno
Public Defender's Service
633 Indiana Avenue, N.W.
Washington, DC 20001-20004

L:\Criminal\Findings of Fact\blunt.duane.f-5785-04 (jkw)

6

**U.S. Department of Justice**

United States Attorney

*District of Columbia*

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20530*

December 16, 2004

Case: U.S. v. DEIGO J PRYOR
PDID No: 0410558
Case Number: F0623504
Filed On: October 6, 2004

Willie Best
219 51st St, NE
Washington, DC

Dear Willie Best :

This letter is being sent to you automatically by computer because you were listed in law enforcement records as a victim (or the representative of a victim) of a crime. You are entitled by law to receive information about this case. The defendant was charged with ROBBERY.

A new prosecutor has been assigned to your case. This prosecutor's name is William Frentzen and the phone number is (202) 514-7630. Please keep this information nearby when you ask questions about the case because this information will be extremely useful to those trying to help you.



EXHIBIT

7

ALL-STATE LEGAL®

Please turn over for more information on Victims' Rights.

Page 2

The Superior Court of the District of Columbia is located at 500 Indiana Avenue, NW. The United States Attorney's Office is located at 555 4th Street, NW. The closest Metro stop for both buildings is the Judiciary Square Metro stop, on the Red Line.

While this case is pending, you may be contacted either by telephone or in person by individuals wishing to discuss the case with you. Please be aware that you are under no obligation to discuss this matter with anyone outside of an official court proceeding. In deciding whether to discuss this matter with any individual who may contact you, you should make sure that you know their proper identity as well as the nature of their interest in the case.

Victims of violent crime may be eligible for payments to help with certain crime-related expenses. For information please call the Crime Victims Compensation Program at 202-879-4216. Staff is available to assist victims of violent crime who need help in completing an application. Victims of non-violent crimes are not eligible for assistance from the Crime Victims Compensation Program.

If the case number on the front of this letter begins with the letter "M", the defendant is charged with a misdemeanor. If you are the victim of a misdemeanor case, you may be offered the opportunity to resolve this case by mediation instead of by going to court. Mediation is NOT available in misdemeanor Domestic Violence cases. If you choose to participate in mediation, regardless of the outcome of the mediation, you will remain entitled to the same services that you would have been entitled to had you chosen to go to court instead of mediation.

Under federal laws and regulations, we are required to notify all victims about the services available to them. These services include:

1.   Referrals for social services, and medical or mental health assistance.

2.   Obtaining a court interpreter if you do not speak English and are required to testify.

3.   Making arrangements for your travel and accommodations if you live outside the Washington, DC area and are required to testify.

4.   Victim advocacy, including assistance in completing a Victim Impact Statement and an application for Crime Victims Compensation.

5.   Providing you with information about witness assistance and protection, and arranging for reasonable witness assistance or protection if you are threatened, harassed or intimidated because of your involvement in this case.

The United States Attorney's Office Victim Witness Assistance Unit can assist you with many of your needs. During business hours, call 202-514-7130 or the assigned attorney with any questions or concerns you may have about your role in this case. If you have an emergency, call 911 and talk to the police.

Sincerely,

The United States Attorney's Office